2026 IL App (1st) 241332-U

No. 1-24-1332

Order filed March 30, 2026

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 1200264 |
| | ) | |
| BRYYANNA NELSON, | ) | Honorable |
| | ) | Joseph Gump, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1    *Held*:   We affirm defendant's conviction for battery over her challenge to the sufficiency of the evidence.

¶ 2    Following a bench trial, defendant Bryyanna Nelson was found guilty of battery and sentenced to six months of supervision. On appeal, defendant contends that there was insufficient evidence that she knowingly made physical contact of an insulting and provoking nature with the victim. We affirm.

¶ 3 Following a September 1, 2022, incident, defendant was charged by misdemeanor complaint with battery (720 ILCS 5/12-3(a)(2) (West 2022)), alleging that, without legal justification, she knowingly and intentionally spit on Savannah Aguilar and made contact with Aguilar's right forearm.

¶ 4 At trial, Aguilar, a Chicago police officer, testified that around 11:20 a.m. on September 1, 2022, she was "called in" to search a woman in a police station lock-up. Aguilar identified defendant in court as that woman. Defendant was noncompliant, erratic, and "talking a lot." She stated that she had "taken a pill" and wanted to go to a hospital, so an ambulance was called. While waiting for the ambulance, defendant vacillated between going to the hospital and not going. The officers told defendant she did not have a choice "at that point." Defendant did not comply with instructions, did not want to be handcuffed, and threw her hair bonnet and jewelry to the ground.

¶ 5 Defendant asked for a sergeant, who helped to handcuff her. Once defendant was placed in a wheelchair, she went limp and fell to the ground. As defendant was placed on a stretcher, she was belligerent, yelled, and made "complaints" that she wanted to be out of the handcuffs and "out of there." Aguilar and other officers stated that they were trying to help defendant and instructed her to stop "resisting." However, defendant stated that Aguilar was hurting her. As Aguilar assisted with defendant's "top half," defendant made a "spit sound." Aguilar felt the "spray" and felt the spittle land on the skin of her right arm.

¶ 6 Aguilar testified that the body camera she wore functioned properly, and that the footage was a fair and accurate representation of events. The State moved to admit the body camera footage, which the trial court allowed. This footage is included in the record on appeal and we have reviewed it.

¶ 7    The record contains an approximately 13-minute video. Audio begins at the two-minute mark. The video depicts defendant, wearing shorts and a tank top, seated on a bench. Defendant is not handcuffed. A male police officer and two female paramedics are also present. Defendant shakes her head as she speaks to the male officer, who then leaves the room.

¶ 8    Defendant then asks why she cannot be handcuffed in the front and Aguilar answers that it is not policy. Defendant does not answer questions from one of the paramedics, but states that she does not "feel good" and does not "care." Aguilar states that "they" are trying to help defendant.

¶ 9    At 3:23, per the timestamp, a sergeant tells defendant that her ambulance has arrived. Defendant again asks why she cannot be handcuffed in the front, and the sergeant replies, "rules." Defendant states that she does not want to go and does not stand up. The sergeant and the male officer take defendant's arms. Defendant asks, "why you grabbing me." Defendant is handcuffed with her arms behind her back. When the officers try to move defendant, she falls to the ground. Defendant is placed on a wheelchair and officers and paramedics attempt to secure her. However, one of the paramedics states that the wheelchair cannot be used if defendant continues to "fight." The second paramedic leaves to obtain a stretcher. Defendant slides off the wheelchair, looks in Aguilar's direction, and says, "don' f*** push me." Aguilar denies pushing defendant and the sergeant states, "she didn't touch you." Defendant reiterates, "yes, she did" and "she f*** pushed me."

¶ 10    Defendant walks to a bench and sits down. She does not answer a paramedic's questions. A stretcher is then wheeled into the room. Aguilar is at the top right hand side of the stretcher as defendant is placed on it. The paramedics are at the bottom of the stretcher. Aguilar places a hand on defendant's shoulder. Defendant then says that she "kicked" because someone pinched her.

Defendant repeatedly yells, "let me go." She sits up and yells that "you're breaking my arm" and "I'm not doing nothing."

¶ 11    At one point, defendant says, "you don't have to hold me" and sits up again. Aguilar places her hands on defendant's shoulder to pull defendant back down. Defendant turns her head toward Aguilar, and makes a "pfht" sound. Aguilar jumps back. Defendant then sits up and says, "stop holding me." Aguilar grabs defendant's shoulder and says, "then stop spitting on me." Defendant replies that "I didn't do nothing to you," and "let me go." Officers and paramedics then strap defendant to the stretcher, and it is rolled out of the room. Defendant continues to state that her arms hurt. She sits up but is ultimately strapped supine to the stretcher. The stretcher is wheeled out and Aguilar washes her arm in a sink. A male voice asks if she was bitten and she says that she was spit on.

¶ 12    The sergeant returns and asks whether Aguilar was spit on. Aguilar replied that it was on her arm. The sergeant then asks if defendant spit on Aguilar or was "just screaming." Aguilar responds, "she f*** spit on me."

¶ 13    At trial, Aguilar identified defendant in the footage and described the sound that defendant made as "coughing up something and spitting." Defendant sat up, turned in Aguilar's direction, and spit on her, the only person in that "area." Aguilar felt that defendant targeted her because she searched defendant. Aguilar could see the spittle on her arm. There was "a lot of spray as well."

¶ 14    During cross-examination, Aguilar testified that, when defendant spit, her arms were handcuffed behind her back, but she could move her upper body up and down as Aguilar and others attempted to place a strap over defendant. Defense counsel then asked whether, based on experience, Aguilar "could tell" defendant was having a "mental issue." Aguilar replied that

defendant stated she "had taken drugs," and emergency services were called. Counsel then asked whether the spit was visible on the body camera footage, and Aguilar stated that she did not know. Counsel played the footage, and Aguilar testified that she "actually" saw spit. She further testified that "after the fact" she had "a good amount" of white saliva on her arm. She did not take a photograph, as she wore a body camera. She did not file an "exposure report" that day.

¶ 15    During redirect examination, Aguilar testified that she later filed an exposure report and an injury on duty report. She could see the spit on the body camera footage and asserted that part of the spit could be seen on her arm.

¶ 16    During recross-examination, Aguilar agreed that she filed the exposure report on December 15 of "2023, probably." (Based on context, we believe that Aguilar misspoke. December 2023 was more than a year after the incident, and in closing argument, defense counsel asserted that Aguilar waited 2½ months to file the report.)

¶ 17    The defense then moved for a directed finding, arguing, *inter alia*, that the evidence did not show an intentional act; rather, defendant was held down while "possibly" having a drug or mental health episode. The trial court denied the motion.

¶ 18    In closing argument, the State asserted that the body camera footage depicted defendant turn and make a sound "indicating she [was] gathering spit." Also, one could see the spit "flying" on the footage. The defense responded that no evidence showed that defendant committed an intentional act or that any spit landed on Aguilar. Counsel also noted that defendant's mental state was "all over the place." Counsel further argued that Aguilar waited 2½ months to file a report, and that defendant, whose hands were behind her back, could not cover her mouth if she coughed.

¶ 19    In finding defendant guilty of battery, the trial court stated that the footage depicted defendant turn her face toward Aguilar. While the court did not know whether it saw "spit flying," it heard defendant spit. Moreover, Aguilar testified that there was "saliva on her arm." The court sentenced defendant to six months of supervision. Defendant filed a motion to reconsider the finding of guilt or for a new trial, which the court denied.

¶ 20    On appeal, defendant contends that the State failed to establish that she knowingly sought to make physical contact with Aguilar, *i.e.*, knowingly spit at Aquilar. Rather, she asserts that she was "acting erratically" and was "not mentally stable." She further argues that because she was handcuffed, she was not "physically able to cover her mouth" when "expelling saliva." Defendant concludes that, at most, her "act of coughing," which resulted in "spraying saliva," was reckless.

¶ 21    When reviewing a challenge to the sufficiency of the evidence, the question is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Jones*, 2023 IL 127810, ¶ 28. It is the responsibility of the trier of fact to weigh, resolve conflicts in, and draw reasonable inferences from, the testimony and other evidence at trial. *People v. Harris*, 2018 IL 121932, ¶ 26. This court does not retry a defendant (*People v. Eubanks*, 2019 IL 123525, ¶ 95), and a conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of her guilt remains (*Harris*, 2018 IL 121932, ¶ 26).

¶ 22    A person commits battery when, relevant here, she knowingly, without legal justification and by any means, makes physical contact of an insulting or provoking nature with an individual. 720 ILCS 5/12-3(a)(2) (West 2022). Knowingly or intentionally spitting on a police officer is physical contact of an insulting or provoking nature. *People v. Peck*, 260 Ill. App. 3d 812, 814-15

(1994); see also *People v. Taylor*, 2022 IL App (4th) 210507, ¶ 20 (finding that the defendant's coughing on a police officer "such that spittle contacted his arm constituted physical contact and supported a conviction for battery").

¶ 23    A person acts knowingly when she is "consciously aware" that "her conduct is practically certain to cause the result." *Id.* ¶ 22; see also 720 ILCS 5/4-5(b) (West 2022). Because intent is a mental state, it is "rarely proved by direct evidence"; rather, it may be proven by circumstantial evidence. *Taylor*, 2022 IL App (4th) 210507, ¶ 22. "Accordingly, intent may be inferred from surrounding circumstances and the character of the defendant's acts." *Id.*

¶ 24    Here, taking the evidence in the light most favorable to the State, a rational trier of fact could have found that defendant acted knowingly when Aguilar testified that defendant turned her head toward Aguilar, made a sound indicating that she was gathering spit, and spit. Aguilar further testified that she saw the spray and felt the spittle on her skin.

¶ 25    Additionally, the body camera footage depicted defendant accusing Aguilar of pushing her, failing to comply with officer and paramedic instructions, and expressing anger at being restrained. Although defendant's hands were cuffed behind her, she could sit up and move her upper body. The body camera footage depicted defendant stating that "you don't have to hold me" and sitting up. Aguilar then placed her hands on defendant's shoulders to pull defendant's torso back to the stretcher. Defendant turned her face toward Aguilar, the only person standing at that side of the stretcher, and made a sound consistent with coughing up liquid and spitting. The footage further depicted Aguilar jumping back, and thereafter stating that defendant spit on her and washing her arm. Given the evidence at trial, a rational trier of fact could have determined that defendant

knowingly made contact of an insulting or provoking nature when she turned her head and spit on Aguilar.

¶ 26    Defendant, however, asserts that her conduct cannot be considered knowing where a mental health episode was not "ruled out." Defendant relies on *People v. Lee*, 2017 IL App (1st) 151652.

¶ 27    In that case, the defendant was charged with aggravated battery of a nurse. *Id.* ¶ 2. The evidence at trial established that the defendant, who had been diagnosed with schizophrenia, tried to commit suicide by overdosing on prescription medication after learning that his son died in a vehicular accident. *Id.* ¶ 10. When the defendant thereafter arrived at a hospital, he yelled "abusively." *Id.* ¶ 3. A nurse noticed that the defendant was wearing a necklace with a metal cross and, pursuant to a hospital policy regarding patients with suicidal thoughts, told the defendant that she needed to take it. *Id.* ¶ 4. The defendant refused. *Id.* The nurse explained that the necklace had to be removed for safety reasons, approached, and leaned over to remove it. *Id.* The defendant "clutched" the cross in his hand and pulled away, and, in so doing, hit the nurse in the forehead with the cross. *Id.* The trial court found the defendant guilty of aggravated battery. *Id.* ¶ 14.

¶ 28    On appeal, the defendant contended that there was insufficient evidence that he intended to cause bodily harm to the nurse or to make physical contact of an insulting or provoking nature with her. *Id.* ¶ 19.

¶ 29    This court determined that the circumstantial evidence and the defendant's conduct did not support the inference that he intended to strike the nurse. *Id.* ¶¶ 20, 21. Rather, the defendant, a diagnosed schizophrenic, was distressed because his son died. *Id.* ¶ 21. When the nurse attempted to remove the defendant's cross over his objection, the defendant "inadvertently" struck her. *Id.*

We noted that the nurse "initiated the struggle with [the] defendant," whom she knew was a diagnosed schizophrenic, "by forcibly removing his necklace over his clear objection" despite his "common-law right to refuse medical treatment." *Id.* ¶ 22. Additionally, the defendant did not dispute that the cross made contact with the nurse; rather, he asserted that he did not intend the outcome, when he merely tried to prevent the nurse from taking an object with sentimental value. *Id.* ¶¶ 21, 22. Accordingly, we reversed the defendant's conviction. *Id.* ¶ 23.

¶ 30    Here, unlike in *Lee*, nothing in the underlying incident reflects that the insulting contact was inadvertent when the body camera footage depicts defendant turn her head toward Aguilar, a spitting sound, and Aguilar jumping back. We are also unpersuaded by defendant's argument that she cannot have acted knowingly because a mental health episode was not ruled out. We note that, at trial, defense counsel asked Aguilar whether, based upon her experience, Aguilar "could tell" defendant was having a "mental issue." Aguilar replied that defendant indicated that defendant "had taken drugs." Thereafter, in its argument in favor of a directed finding and at closing, the defense noted that defendant acted erratically and raised the possibility that her actions were involuntary due to a drug episode or a mental health episode. Thus, the defense theory that defendant's actions were involuntarily caused by a mental health episode was presented to the trial court. However, a trier of fact is not "required to accept the defendant's version of the facts." See *People v. Jacobs*, 2016 IL App (1st) 133881, ¶ 53.

¶ 31    To the extent that defendant asserts that the body camera footage depicts a mental health crisis, we note that portions of the footage depict defendant sitting relatively calmly in a holding cell. When defendant's hands are cuffed behind her, despite her requests to be cuffed in the front, she objects and thereafter falls to the ground. She is physically uncooperative when officers and

paramedics attempt to secure her in a wheelchair, falls limp to the ground, and accuses Aguilar of pushing her. When efforts to put defendant in the wheelchair are discontinued, she then walks back into the holding cell and sits down. When officers and paramedics subsequently attempt to secure defendant to a stretcher, she is vocally upset, swears, asks that she not be restrained, and sits up several times complaining of specific discomforts. Accordingly, based upon our review of the body camera footage, we are unpersuaded by defendant's argument that it depicts a mental health crisis. See, *e.g.*, *People v. Shaw*, 2015 IL App (1st) 2015 IL App (1st) 123157, ¶ 29 (citing *People v. Radojcic*, 2013 IL 114197, ¶ 34 (the "trial court does not occupy a position superior to the appellate courts in evaluating evidence that is not live testimony," *i.e.*, "we give less deference to a trial court's determinations of fact when they are based on evidence other than live witness testimony)).

¶ 32   Defendant further argues that the evidence established that her conduct was reckless in that she consciously disregarded a substantial risk that the act of coughing would result in "spraying saliva." However, the footage depicted defendant turn her head toward Aguilar and make a sound as though she was gathering spit, rather than a cough, and Aguilar jumping back. Aguilar also testified that defendant made a spitting sound, Aguilar then felt spray and spittle on her arm, and she saw a good amount of spittle on her arm. The trial court found Aguilar credible, as evidenced by its guilty finding. A trier of fact "need not disregard inferences that naturally flow from the evidence or accept all possible explanations consistent with [a] defendant's innocence and elevate them to the status of reasonable doubt." *People v. Moore*, 2023 IL App (1st) 211421, ¶ 90. Here, a rational trier of fact could have found that defendant knowingly spit on Aguilar based upon

Aguilar's testimony that defendant spit on her and from the body camera footage, which depicted defendant turn toward Aguilar and make a noise consistent with gathering spit.

¶ 33    We reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that reasonable doubt of her guilt remains (*Jones*, 2023 IL 127810, ¶ 28); this is not one of those cases. We therefore affirm defendant's conviction for battery.

¶ 34    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 35    Affirmed.