2026 IL App (1st) 240827

First District
Third Division
March 31, 2026

No. 1-24-0827

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21 CR 11890 01 |
| PAUL WOODHOUSE, | ) ) ) | The Honorable Nicholas Kantas, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

JUSTICE REYES delivered the judgment of the court, with opinion.
Presiding Justice Martin and Justice Rochford concurred in the judgment and opinion.

**OPINION**

¶ 1      After a bench trial, defendant Paul Woodhouse was convicted of aggravated unlawful use of a weapon (720 ILCS 5/24-1.6 (West 2020)) and unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2020)) based on the recovery of a firearm during the course of a traffic stop, and was sentenced to concurrent three-year terms in the Illinois Department of Corrections (IDOC). On appeal, defendant contends that the State failed to prove his possession of the firearm beyond a reasonable doubt, and further argues that both statutes are unconstitutional. In the alternative, defendant claims that one of his convictions should be vacated on one-act, one-crime grounds. For the reasons set forth below, we affirm defendant's conviction for unlawful possession of a weapon by a felon, but vacate the conviction for aggravated unlawful use of a weapon and order the mittimus corrected.

¶ 2                                   BACKGROUND

¶ 3         Defendant was the driver of a vehicle that was stopped by police on August 24, 2021, due to a missing front license plate. During the course of the traffic stop, a search of defendant's name returned an active warrant from Du Page County. While defendant indicated that the warrant had been quashed, he refused consent for police to search his vehicle for documentary proof. Police placed defendant into custody, and he was brought to the police station. A search of defendant's vehicle revealed a firearm stored in a factory installed hidden compartment within the vehicle, and defendant was arrested. Defendant was subsequently indicted on (1) one count of aggravated unlawful use of a weapon due to his lack of a firearm owner's identification (FOID) card and (2) one count of unlawful possession of a weapon by a felon due to a prior conviction for armed robbery.

¶ 4         Defendant filed a motion to quash his arrest and to suppress the firearm evidence, which he later withdrew, and the matter proceeded to a bench trial. At trial, the State presented the testimony of Michael Mendez, the Chicago police officer performing the traffic stop, while defendant presented the testimony of Rodney Jones, the alleged owner of the firearm.

¶ 5         Mendez testified that, at approximately 1:50 a.m. on August 24, 2021, he was on routine patrol with his partner when he observed a white Chevy Impala with no front license plate.[1] Mendez, who was driving a marked police vehicle, activated the vehicle's emergency equipment and curbed the Impala. Mendez approached the Impala, in which the driver, identified in court as defendant, was the sole occupant. Mendez asked defendant to provide his driver's license, which he did, then proceeded to ask his "standard field questions," including

_____

[1] The record indicates that the license plate was subsequently discovered to be propped on the vehicle's front dashboard.

whether defendant possessed a concealed carry license or if there were any weapons in the vehicle. Defendant denied both. Mendez returned to the police vehicle, where he ran defendant's name through the LEADS system. The name check returned an "active warrant" out of Du Page County. At that point, Mendez requested another police vehicle to the scene to assist in placing defendant into custody safely.

¶ 6      Once the other vehicle arrived, Mendez exited the police vehicle and returned to defendant. He ordered defendant to exit the Impala, which he did, and police placed him into custody "without incident." As defendant was ordered out of the Impala, he grabbed a piece of paper from the visor area, informing Mendez that the warrant had been quashed. Mendez looked at the paper when he placed defendant into custody, but "it was not anything involving a warrant." Mendez offered to look for documentation regarding a quashed warrant, but defendant declined. Mendez explained that defendant would not be permitted to search for the document himself, as "he was, right now, in custody for an active warrant, and *** it would be a serious safety concern for me to let him out of handcuffs to look for this piece of paper." Mendez conducted a search of the vehicle for "five to ten minutes approximately," but was unable to find any paperwork concerning the warrant.

¶ 7      After placing defendant into custody and determining that the warrant was still active, Mendez decided to take defendant to the police station for booking and processing, as well as to verify the validity of the warrant.[2] Mendez also decided to relocate the Impala to the police station as "arrestee property." Mendez testified that he did not fully search the vehicle on scene due to the presence of a bystander who was "heckling" him and his partner throughout the stop,

---

[2] Mendez did not testify as to the subject of the warrant or whether the warrant was ultimately determined to be valid.

so "[d]ue to safety concerns, we felt it was better" to relocate the vehicle to the police station. Defendant requested that the vehicle not be towed and, instead, that his cousin be permitted to take the vehicle. Mendez's partner ultimately drove the Impala to the police station, while Mendez transported defendant.

¶ 8        Upon arriving at the police station, Mendez and his partner searched the Impala, as "per inventory search, we must do a search looking for any kind of valuable property." While searching the vehicle, Mendez knew "based on prior experience with this particular vehicle" that there was a factory installed hidden compartment in the center console. He turned the vehicle on, pressed a button to reveal the compartment, and opened it. Inside the compartment, Mendez discovered a loaded nine-millimeter Glock 43 pistol in a holster; the firearm had one bullet in the chamber and an "unknown number of rounds" in the magazine.

¶ 9        Mendez testified that he was wearing a body-worn camera during the traffic stop, and the parties stipulated to the admissibility of the video from the camera. The video was published to the trial court, and is contained in the record on appeal; the video depicts the entirety of the traffic stop, from the initial curbing of defendant's vehicle through the search which revealed the firearm. As relevant to the instant appeal, the video depicts Mendez approaching the Impala after it has been transported to the police station. Mendez's partner is next to the driver's door, and Mendez walks to the front passenger's side door and opens it. After searching the front passenger's seat area, he closes the door and begins to walk away, before returning and opening the door. He reaches across the vehicle and turns it on, then pushes at the dashboard directly above the center console (where the screen for the radio and other amenities is located). The view from the video does not depict the area, but shortly after pushing, Mendez indicates that he has discovered a firearm. As he rises, the view from the body-worn camera shifts, revealing

the interior of the vehicle. The screen has slid vertically upwards from the dashboard, revealing an open compartment behind it.

¶ 10        On cross-examination, Mendez testified that defendant was compliant during the entirety of the traffic stop and did not display any signs of nervousness. Mendez further testified that, absent the warrant, defendant likely would have received either a citation or a verbal warning and would not have been taken into custody, especially given his level of cooperation.

¶ 11        After Mendez's testimony, the State offered three stipulations into evidence: (1) that defendant was the registered owner of the Impala, (2) that defendant had a prior felony conviction, and (3) that defendant did not possess a valid FOID card on the date of the traffic stop. The State then rested, and the defense made a motion for directed finding, which was denied.

¶ 12        Rodney Jones then testified on behalf of defendant. Jones testified that he had known defendant for over a decade, having met when defendant performed work on Jones' vehicle. Jones was issued a FOID card in 2020 and, around that same time, purchased a firearm at a sporting goods store in Danville, Illinois. Jones could not initially recall the type of firearm he purchased or the date of the purchase, but after refreshing his recollection, testified that he purchased a nine-millimeter firearm on August 9, 2020; he testified that the brand of the firearm was "I think a Smith & Wesson." After being shown a receipt, Jones testified that the firearm was a Glock. The receipt was admitted into evidence, and a photo of the receipt is included in the record on appeal. It is dated August 9, 2020, and is for a "Glock 43 9MM." Jones' name and address is at the bottom of the receipt.

¶ 13        Jones testified that on August 21, 2021, he borrowed defendant's Impala to drive and left the firearm "[i]n the concealed compartment." When asked where inside the vehicle he left the

firearm, Jones testified "it was like in a glove box part, something like that" on the vehicle's dashboard. He returned the Impala to defendant without removing the firearm.

¶ 14     On cross-examination, Jones testified that he could not recall the serial number of the firearm and, when asked how many firearms he owned, responded "[n]one." After his testimony, the parties stipulated to evidence that Jones had been issued a FOID card on March 9, 2020, which was revoked on February 18, 2021.

¶ 15     After both parties rested and had presented closing arguments, the trial court found defendant guilty of both charges. The trial court observed that there had been no connection established between the receipt submitted into evidence and the firearm recovered in defendant's vehicle to suggest that they concerned the same firearm and further noted that the receipt was for a firearm which had been purchased "a whole year" prior to defendant's arrest. The trial court gave "not much weight" to Jones' testimony, as he could not recall the type of firearm he purchased, when he purchased it, or the firearm's serial number. The trial court noted that Jones needed to have his memory refreshed "as to when he bought the gun, where he bought the gun, [and] what type of gun it was" that he purchased.

¶ 16     The trial court further found it "very curious" that "this forgetful witness then decides to leave the gun in the car." The trial court also noted that the record was devoid of any explanation as to "why someone would just put a gun in a car and then walk away from it." The trial court explained that "[t]hat's the question that the court is left with if I am going to give credibility to that witness' testimony as to what were the motivations to leave the gun there and what would he do with that very expensive valuable item that people just don't happen to leave."

¶ 17    The trial court found that there was some evidence that defendant had familiarity with automobiles, as Jones had testified that defendant had installed speakers in his vehicle, but noted that "I wouldn't suggest that only that would be sufficient." The trial court further indicated that "I don't give much weight to his actions when he is detained or arrested or really his statements at all. *** I found him to be cooperative and I don't feel that he was especially wanting people to not search his vehicle, probably just like anybody would not want their car searched or towed or go to that expense." The trial court, however, found that "what I do have before me is credible evidence by the State as to his ownership of the vehicle, his sole possession of the vehicle at the time, and the gun being recovered from the compartment versus the *** incredible testimony of the Defense witness whose weight this court is going to give his testimony zero weight." Accordingly, the trial court found defendant guilty of both offenses.

¶ 18    Defendant filed a motion for new trial. In addition, defendant filed a motion to dismiss his indictment, claiming that the statutes under which he was convicted were unconstitutional, both facially and as applied to him, as they violated the second amendment of the United States Constitution (U.S. Const., amend. II). Both of defendant's motions were denied, and he was ultimately sentenced to concurrent three-year terms, plus one year of mandatory supervised release, for both convictions. After the denial of defendant's motion to reconsider sentence, defendant timely filed a notice of appeal, and this appeal follows.

¶ 19                                ANALYSIS

¶ 20    On appeal, defendant contends that the State failed to prove his constructive possession of the firearm beyond a reasonable doubt and, in any event, that both statutes are unconstitutional.

In the alternative, defendant claims that one of his convictions should be vacated on one-act, one crime grounds. We consider each argument in turn.

¶ 21                                        *Sufficiency of the Evidence*

¶ 22        Defendant first claims that the State failed to prove his possession of the firearm beyond a reasonable doubt. When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness' testimony. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009); *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Instead, "it is our duty to carefully examine the evidence while bearing in mind that the trier of fact is in the best position to judge the credibility of witnesses, and due consideration must be given to the fact that the fact finder saw and heard the witnesses." *People v. Herman*, 407 Ill. App. 3d 688, 704 (2011) (citing *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004), and *Smith*, 185 Ill. 2d at 541).

¶ 23        In this case, both offenses for which defendant was convicted require proof of knowing possession of a firearm. Specifically, the aggravated unlawful use of a weapon charge required the State to prove (1) that defendant knowingly carried a firearm in his vehicle while (2) failing to possess a valid FOID card (see 720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2020)), while the unlawful possession of a weapon by a felon charge required the State to prove (1) that

defendant knowingly possessed a firearm on or about his person while (2) having been convicted of a felony (see *id.* § 24-1.1(a)). On appeal, defendant does not dispute that he lacked a FOID card or that he had previously been convicted of a felony. He, however, contends that the State failed to prove his possession of the firearm.

¶ 24    Possession may be either actual or constructive. *People v. Jones*, 2023 IL 127810, ¶ 30. As the firearm in the instant case was found near defendant, not on his person, the State was required to prove constructive possession. See *id.* (ammunition in vehicle glove compartment presented question concerning constructive possession); see also *People v. Wise*, 2021 IL 125392, ¶ 24 (equating possession " 'on' " the defendant's person with actual possession, and possession " 'about' " his person with constructive possession). "To establish constructive possession, the State must prove that the defendant knew contraband was present and that the defendant exercised immediate and exclusive control over the area where the contraband was found." *Jones*, 2023 IL 127810, ¶ 30.

¶ 25    In this case, defendant does not challenge whether the compartment was an area over which he had immediate and exclusive control—he was the registered owner of the vehicle, he was the only occupant of the vehicle at the time of the traffic stop, and the compartment was located in close proximity to where defendant was seated in the vehicle. See *id.* ¶ 33 (finding sufficient evidence of control where ammunition was found in glove compartment of a vehicle owned by the defendant which she was driving). Instead, he claims that he did not know that the firearm was present, as it was placed inside the compartment by Jones without defendant's knowledge.

¶ 26    As knowledge is the "mental element" of the offense, it is often proven by circumstantial evidence rather than by direct proof. *Id.* ¶ 30; see *People v. Walker*, 2020 IL App (1st) 162305,

¶ 20 ("Constructive possession is almost always subject to proof by circumstantial evidence."). Proof that a defendant had control over the premises where contraband is located gives rise to an inference of knowledge and, therefore, possession. *People v. Givens*, 237 Ill. 2d 311, 335 (2010).

¶ 27     Here, where defendant had control over the premises where the firearm was located, there is an inference that defendant knew of the firearm's presence. Defendant, however, contends that this inference was unwarranted where he displayed no signs suggesting that he was aware of the presence of the firearm during the course of the traffic stop and where he presented evidence that Jones owned the firearm and concealed it within the compartment without defendant's knowledge. We do not find either argument persuasive.

¶ 28     With respect to defendant's conduct during the traffic stop, the trial court found that defendant was cooperative and declined to adopt the State's suggestion that his reluctance to have his vehicle towed was evidence of his knowledge of the firearm. Based on its findings of fact, then, it does not appear that defendant's actions played any role in the trial court's ultimate conclusion that defendant possessed the firearm. Indeed, the trial court's findings are entirely consistent with defendant's arguments on appeal—that defendant did not exhibit signs demonstrating awareness of any contraband.

¶ 29     We observe that gestures by a defendant indicating an effort to retrieve or hide a weapon may be a factor from which knowledge may be inferred. See *People v. Bailey*, 333 Ill. App. 3d 888, 892 (2002). Defendant, however, does not cite to any authority suggesting that a lack of such gestures necessarily demonstrates a lack of knowledge. In other words, there is no requirement that a defendant display outward signs of knowledge before a court may properly find possession. As noted, a defendant's knowledge is most often proved by circumstantial

evidence (*Jones*, 2023 IL 127810, ¶ 30), and there is an inference of knowledge where the defendant had control over the premises where contraband is located (*Givens*, 237 Ill. 2d at 335), as defendant did here. Thus, taking the evidence in the light most favorable to the prosecution, where defendant does not dispute that the hidden compartment was an area over which he exercised immediate and exclusive control, a rational trier of fact could have found that defendant had knowledge of the presence of the firearm. See *Jones*, 2023 IL 127810, ¶ 37.

¶ 30        The cases relied on by defendant do not suggest a different result. In both *People v. Bailey*, 333 Ill. App. 3d 888 (2002), and *People v. Hampton*, 358 Ill. App. 3d 1029 (2005), the appellate court applied a nonexclusive four-factor test, derived from *People v. Davis*, 50 Ill. App. 3d 163 (1977), for determining when a defendant's knowledge of a weapon in a vehicle could be inferred. Importantly, however, in neither case was the defendant the owner of the vehicle in which the firearm was discovered. See *Bailey*, 333 Ill. App. 3d at 889 (defendant was passenger in a vehicle); *Hampton*, 358 Ill. App. 3d at 1031 (vehicle defendant was driving belonged to his late brother and he had not used it before). While defendant suggests that this distinction is unimportant, we disagree. To be clear, a defendant's status as the vehicle's owner does not automatically put him in possession of everything within the passenger area where there are other passengers present who may be the ones in possession of the contraband. See *People v. Wise*, 2021 IL 125392, ¶ 28. Whether a defendant has a possessory or ownership interest in the vehicle, however, is relevant circumstantial evidence of knowledge. *Bailey*, 333 Ill. App. 3d at 892. Here, defendant was the owner of the vehicle, he was the driver of the vehicle, and he was the only occupant of the vehicle at the time that the firearm was discovered. As such, a rational trier of fact could have determined that defendant had knowledge of the firearm, despite defendant's lack of outward signs of knowledge.

¶ 31        We similarly cannot find that the alternate explanation for the firearm's presence by the defense witness necessitates reversal. During his testimony, Jones testified that he purchased a firearm in 2020, and the evidence established that on August 9, 2020, Jones purchased a "Glock 43 9MM" firearm from a store in Danville. The evidence further established that the firearm recovered from defendant's vehicle was a nine-millimeter Glock 43 pistol. Jones testified that the firearm recovered from defendant's vehicle was the same firearm he had purchased and that he had stored the firearm inside the vehicle's hidden compartment when he borrowed it from defendant approximately two days before the traffic stop.

¶ 32        The trial court, however, found Jones' testimony not to be credible. The trial court observed that Jones was unable to recall the type of firearm he purchased, when he purchased it, or the firearm's serial number, and found that, as a result, "not much weight" could be given to Jones' testimony as to his ownership of the firearm at issue. The trial court further noted that, other than Jones' testimony, no connection had been made between the receipt submitted into evidence and the firearm recovered in defendant's vehicle and observed that the firearm purchased by Jones had been purchased a year prior to defendant's arrest. The trial court also found "very curious" the fact that Jones would leave the firearm in the vehicle, as it was a "very expensive valuable item that people just don't happen to leave," and observed that Jones provided no explanation for his behavior.

¶ 33        As noted, the trier of fact is in the best position to judge the credibility of witnesses, and "due consideration must be given to the fact that the fact finder saw and heard the witnesses." *Herman*, 407 Ill. App. 3d at 704. On review, we will not substitute our judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness' testimony. See *Jackson*, 232 Ill. 2d at 280-81; *Ross*, 229 Ill. 2d at 272. Here, defendant in

12

essence asks us to reweigh the evidence and place weight onto Jones' testimony which the trial court determined was not warranted. This, however, we cannot do. The trial court's credibility determination was based on its observation of the live witness testimony, and we will not second-guess such a determination based on a cold record.

¶ 34     We find unpersuasive defendant's suggestion that the trial court improperly discounted Jones' testimony based on its subjective determination that it was unlikely that someone would leave a firearm in a vehicle. Defendant's argument overlooks the fact that the trial court's credibility determination did not rest solely on this basis. Instead, the trial court made clear that Jones' testimony was entitled to "not much weight" due to Jones' inability to recall basic details and information of his firearm purchase—what, when, and where. This is especially notable where Jones also testified that he owned no firearms, suggesting that the firearm at issue was the only firearm he owned; in other words, this was not a case in which he was asked to recall details concerning one of many firearms. Moreover, in addition to Jones' lack of recall as to the purchase, Jones provided the less-than-precise description of "it was like in a glove box part, something like that" when asked where the hidden compartment was located within the vehicle. Thus, it is clear that the trial court's determination that it would give "zero weight" to Jones' "incredible" testimony was based on the entirety of his testimony, not merely the trial court's skepticism as to Jones' account of leaving the firearm inside the vehicle.

¶ 35     We also observe that, despite counsel's suggestion to the contrary during oral argument, whether Jones owned the firearm at issue is not the primary focus when considering the question of possession. As noted, "[t]o establish constructive possession, the State must prove that the defendant knew contraband was present and that the defendant exercised immediate and exclusive control over the area where the contraband was found." *Jones*, 2023 IL 127810,

¶ 30. There is no requirement that the defendant own the contraband at issue to have possession. See *People v. Wade*, 2024 IL App (1st) 230879-U, ¶ 93 ("we have long held that ownership [of contraband] is not a necessary prerequisite for constructive possession"); see also *People v. O'Neal*, 35 Ill. App. 3d 89, 91 (1975). Moreover, Jones' ownership of the firearm is in no way inconsistent with defendant's possession of the weapon at the time of the traffic stop, as under Jones' version of events, Jones placed the firearm inside defendant's vehicle, thereby explaining why Jones' firearm would be in defendant's possession.

¶ 36    Finally, we find that defendant's contention that a trial court's credibility determination may be set aside in certain circumstances is inapplicable here. Defendant suggests that "[w]hen the fact-finder disregards defense testimony that is internally consistent, corroborated by the record, and unsuccessfully discounted by the State, its credibility determination may be set aside." The case defendant cites for this proposition, however, says no such thing. The cited case instead concerns a trial court's improperly *crediting* witness testimony, providing that "a trial court's finding of witness credibility may be set aside in the face of serious inconsistencies and/or repeated impeachment of witness testimony." *People v. Williams*, 383 Ill. App. 3d 596, 643 (2008). Here, the trial court did not credit Jones' testimony and defendant does not contend that the witness whose testimony the trial court *did* credit—Officer Mendez—was in any way incredible. More importantly, in this case, Jones' testimony was not, in fact, "internally consistent, corroborated by the record, and unsuccessfully discounted by the State." As explained above, Jones' testimony had several weaknesses which supported the trial court's decision not to give it any weight. Consequently, we cannot find any basis for setting aside the trial court's credibility determination.

14

¶ 37    As noted, proof that a defendant had control over the premises where contraband is located gives rise to an inference of knowledge and possession of the contraband. *Givens*, 237 Ill. 2d at 335. Here, there is no dispute that defendant had control over the vehicle and the hidden compartment within—he was the owner of the vehicle, he was the sole occupant of the vehicle at the time of the traffic stop, and the hidden compartment was in close proximity to his location within the vehicle. Thus, examining the evidence in the light most favorable to the State, we cannot find that the trial court's determination that defendant possessed the firearm at issue was against the manifest weight of the evidence. Accordingly, we affirm the trial court's findings that the State had established all elements of the offenses beyond a reasonable doubt.

¶ 38                                *Second Amendment*

¶ 39    Defendant next contends that his convictions should be reversed where the statutes under which he was convicted violate the second amendment to the United States Constitution. All statutes carry a strong presumption of constitutionality, and a statute will be found constitutional "if it can be reasonably done." *People v. Mosley*, 2015 IL 115872, ¶ 22. In order to overcome this presumption, "the party challenging the statute must clearly establish its invalidity." *Id.* The question of whether a statute is constitutional is a question of law, which we review *de novo*. *Id.* A defendant raising a facial challenge to a statute, as defendant does here, "faces a particularly heavy burden." *People v. Bochenek*, 2021 IL 125889, ¶ 10. "A statute will be deemed facially unconstitutional only if there is no set of circumstances under which the statute would be valid." *Id.* Accordingly, the specific facts concerning the challenging party are "irrelevant" to the constitutional analysis. *Id.*

¶ 40    In this case, defendant challenges both the aggravated unlawful use of a weapon (720 ILCS 5/24-1.6 (West 2020)) and unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a)

(West 2020)) statutes under which he was convicted. Specifically, defendant contends that the requirement for a FOID card in the aggravated unlawful use of a weapon statute is inconsistent with the historical tradition of firearm regulation, and maintains that felons may not be constitutionally prevented from possessing firearms.

¶ 41 The second amendment to the United States Constitution provides that, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. The United States Supreme Court has interpreted this language to "protect the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 8-9 (2022) (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. Chicago*, 561 U.S. 742 (2010)). It is clear, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626.

¶ 42 In *Bruen*, the Supreme Court set forth a two-part test to apply in order to determine whether a statute violates the second amendment:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 49 n.10 (1961)).

16

Defendant argues that the statutes under which he was convicted do not satisfy the *Bruen* test and, therefore, his convictions must be reversed.

¶ 43    As an initial matter, we note that, during the pendency of briefing on the instant appeal, the Illinois Supreme Court issued a decision in *People v. Thompson*, 2025 IL 129965, upholding the constitutionality of the subsection of the aggravated unlawful use of a weapon statute requiring a concealed carry license (CCL). In doing so, the supreme court observed that the CCL licensing regime "incorporates FOID card licensure" (*id.* ¶ 17) and discussed both in its analysis. Decisions of the Illinois Supreme Court are binding on all lower courts (*People v. Artis*, 232 Ill. 2d 156, 164 (2009)) and, accordingly, we have no need to further consider defendant's arguments concerning the constitutionality of the FOID card requirement as contained in the aggravated unlawful use of a weapon statute. Consequently, we address only defendant's claim concerning the unlawful possession of a weapon by a felon statute.

¶ 44    Defendant's constitutional challenge to the unlawful possession of a weapon by a felon statute has been repeatedly considered and uniformly rejected by our courts since *Bruen* was decided. See *People v. Honorable*, 2025 IL App (5th) 220743-U, ¶ 30 (collecting cases). We reach the same result here.

¶ 45    As noted, the first step of the *Bruen* analysis is to determine whether the plain text of the second amendment covers the challenged conduct. See *Bruen*, 597 U.S. at 17. We observe that courts have reached differing conclusions on the question of whether possession of a firearm by a felon is encompassed by the plain text of the second amendment, with some courts concluding that the second amendment does not apply to individuals who are not "law-abiding citizens." See, *e.g.*, *People v. Macias*, 2025 IL App (1st) 230678, ¶ 28 (noting split in approach); *People v. Grace*, 2025 IL App (1st) 232429-U, ¶¶ 14-16 (same).

¶ 46    Here, we agree with defendant that his status as a felon is more appropriately considered under the second step of the *Bruen* analysis and that the challenged conduct under the statute— possession of a firearm—is encompassed by the plain text of the second amendment. See 720 ILCS 5/24-1.1(a) (West 2020) (prohibiting an individual from "knowingly possess[ing] *** any firearm" after having been convicted of a felony); see also *People v. Brooks*, 2023 IL App (1st) 200435, ¶¶ 84-87 (finding that, for purposes of the armed habitual criminal statute, the "proscribed conduct" was the possession of a firearm, which is encompassed by the plain text of the second amendment); *Macias*, 2025 IL App (1st) 230678, ¶ 28 (same); *People v. Doehring*, 2024 IL App (1st) 230384, ¶ 24 (finding that a focus on the conduct being proscribed instead of the circumstances surrounding such possession "better comports with the requirements in *Bruen*").

¶ 47    We agree with the State, however, that under the second step of the *Bruen* analysis, the unlawful possession of a weapon by a felon statute is consistent with the historical tradition of firearm regulation. In *Brooks*, a different division of this court conducted an extensive analysis of the historical tradition related to the disarming of felons—violent and nonviolent—in comparison with the armed habitual criminal statute. See *Brooks*, 2023 IL App (1st) 200435, ¶¶ 90-105. We find the analysis contained therein amply supports a finding that the unlawful possession of a weapon by a felon statute is similarly consistent with the nation's history of firearm regulation and, therefore, agree with the numerous courts that have upheld the constitutionality of the statute under the second amendment.

¶ 48    *One-Act, One-Crime*

¶ 49    Finally, defendant contends that, at a minimum, his conviction for aggravated unlawful use of a weapon should be vacated where it was based on the same act underlying his unlawful

possession of a weapon by a felon conviction. Under the one-act, one-crime rule, multiple convictions are improper if they are based on the same physical act. *People v. Smith*, 2019 IL 123901, ¶ 13. Whether a defendant was incorrectly sentenced for multiple offenses based upon the same act is a question of law that this court reviews *de novo*. *People v. Coats*, 2018 IL 121926, ¶ 12.

¶ 50    In this case, defendant contends that both of his convictions were based on precisely the same physical act, namely, his possession of the firearm, and, therefore, multiple convictions were not permitted. The State agrees, as do we. As both of defendant's convictions were premised on the possession of the same firearm, they violate the one-act, one-crime rule, and the less serious offense must be vacated. See, *e.g.*, *People v. Johnson*, 237 Ill. 2d 81, 97-98 (2010) (finding a one-act, one-crime violation where defendant was convicted of both aggravated unlawful use of a weapon and unlawful possession of a weapon by a felon, based on the possession of a single firearm, and ordering the lesser count vacated). Based on defendant's prior criminal history, the aggravated unlawful use of a weapon conviction was a class 2 felony for which the sentencing range was 3 to 7 years, while the unlawful possession of a weapon by a felon conviction was a class 2 felony for which the sentencing range was 3 to 14 years. See 720 ILCS 5/24-1.6(d)(3), 24-1.1(e) (West 2020). We accordingly vacate the less serious offense of aggravated unlawful use of a weapon and direct the clerk of the circuit court to correct defendant's mittimus by vacating the aggravated unlawful use of a weapon conviction.

¶ 51                                    CONCLUSION

¶ 52    Defendant's conviction for unlawful possession of a weapon by a felon is affirmed, where the evidence was sufficient for a rational trier of fact to have found defendant's possession of

the firearm beyond a reasonable doubt, and the statute under which he was convicted is constitutional. Defendant's conviction for aggravated unlawful use of a weapon, however, is vacated, as it violates the one-act, one-crime rule, and we order the mittimus corrected accordingly.

¶ 53        Affirmed in part and vacated in part; mittimus corrected.

---

*People v. Woodhouse*, 2026 IL App (1st) 240827

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-CR-1189001; the Hon. Nicholas Kantas, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Chan Woo Yoon, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Erin K. Slattery, and Margaret A. Hillmann, Assistant State's Attorneys, of counsel), for the People. |

---